**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

---

|  |  |  |
|---|---|---|
| **JOHN PITTMAN**, | ) | No. _____ |
|  | ) |  |
| *Petitioner*, | ) |  |
|  | ) | May 6, 2020 |
| v. | ) |  |
|  | ) | **PETITION FOR WRIT OF** |
| **ROLLIN COOK**, Commissioner, | ) | **HABEAS CORPUS AND** |
| Connecticut Department of Correction; and | ) | **REQUEST FOR EMERGENCY** |
| **KENNETH BUTRICKS**, Warden, | ) | **ADMISSION TO BAIL** |
| Cheshire Correctional Institution, | ) |  |
|  | ) |  |
| *Respondents*. | ) |  |

---

### PRELIMINARY STATEMENT

1. Petitioner John Pittman is a 66-year-old man who suffers from Hepatitis C. He is currently incarcerated at Cheshire Correctional Institution and has been in the custody of the Connecticut Department of Correction (DOC) for over 34 years. In light of the grave threat to his life and health caused by COVID-19, and his undisputed presence in multiple high-risk categories for severe disease as identified by the Centers for Disease Control, Mr. Pittman seeks immediate release on the ground that he is in custody in violation of the Eighth Amendment to the United States Constitution.

2. COVID-19 is a highly infectious, novel coronavirus that has infected millions of individuals across the world. Prisons are particularly susceptible to rapid, uncontrolled viral spread due to close contact between incarcerated individuals, poor sanitation, and insufficient medical resources. These conditions place Mr. Pittman at a high risk of severe illness or death from COVID-19.

1

3.  Mr. Pittman petitions this Court for a writ of habeas corpus to remedy his prolonged
    confinement in unlawfully dangerous conditions, and also seeks his immediate admission
    to bail pending a decision on the underlying petition.

## PARTIES

4.  Petitioner John Pittman is a 66-year-old inmate housed in the T.R.U.E. Unit at the
    Cheshire Correctional Institution of the DOC.[1] He has completed over 34 years of a sixty
    year sentence. According to DOC records, his current estimated release date will take
    place on January 22, 2027, when he is 73 years old.[2] He has a minimal disciplinary
    history.[3] Mr. Pittman is a founding member of and a model inmate in the T.R.U.E. Unit.

5.  Respondent Rollin Cook is the Commissioner of the DOC.

6.  Respondent Kenneth Butricks is the warden of Cheshire CI.

## JURISDICTION

7.  The Court has subject matter jurisdiction over this Petition under Article I, § 9, cl. 2 of
    the U.S. Constitution; the Eighth Amendment of the U.S. Constitution; 28 U.S.C. § 1331;
    28 U.S.C. § 1651; and 28 U.S.C. § 2241, or in the alternative 28 U.S.C. § 2254.

---

[1] The T.R.U.E. Unit is a prison model in which older, successful inmates act as mentors to younger inmates in order to help them adapt to prison life, and to take advantage of the programs and training that prison has to offer, with the ultimate goal of reducing recidivism. The program has dramatically lowered the rate of disciplinary incidents for those participating in the program. Based on currently available data, it appears that inmates released home from T.R.U.E. commit new offenses at rates lower than other former inmates. *See, e.g.*, Maurice Chammah, *The Connecticut Experiment*, The Marshall Project (May 8, 2018), https://www.themarshallproject.org/2018/05/08/the-connecticut-experiment; *Dispatches from T.R.U.E.*, Vera Institute of Justice, https://www.vera.org/blog/dispatchesfrom-t-r-u-e; Erik Ofgang, *How Scott Semple Helped Turn Connecticut's Prisons Into a Nationally Recognized Laboratory of Reform*, Connecticut Magazine (May 21, 2019), https://www.connecticutmag.com/issues/features/how-scott-semple-helped-turn-connecticut-s-prisons-into-a/article_e6e733cc-78af-11e9-b468-87e688e6aae5.html.

[2] *See* Attachment A, DOC Timesheet, dated 4/6/20.

[3] *See* Attachment B, DOC Disciplinary Reports, dated 4/14/20.

**VENUE**

8.  Venue is proper in the District of Connecticut because Petitioner is physically present in Connecticut in the custody of Respondents, and because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district. 28 U.S.C. § 1391(b).

**FACTS**

### I.  Petitioner John Pittman

#### a.  *The Evidence at the Underlying Trial*

9.  On April 27, 1987, Mr. Pittman was convicted of murder, C.G.S. Sec. 53a-54a, after a jury trial. He was sentenced to a term of 60 years in prison.[4] The Connecticut Supreme Court upheld his conviction on appeal. *See State v. Pittman*, 209 Conn. 596 (1989).

10. John Pittman's wife, Gloria Pittman, went missing from her home in Hartford on October 13, 1985. She was last seen by Mr. Pittman walking away from her car in Keney Park in Hartford after she exited the vehicle when the couple had an argument over a bounced check. On November 12, 1985, he was arrested and charged with her murder without the police having located her body or knowing the scene of her death. In April 1986, the skeletal remains of Gloria Pittman were found in the Mill River in New Haven. She had been stabbed to death and two of her ribs had been severed.

11. The evidence against Mr. Pittman was largely circumstantial, with the exception of testimony from two incentivized witnesses, Mitchell Henderson and Gregory Blue. Blue is now deceased. The other witnesses were the children of Gloria Pittman, who ranged in age from eight to sixteen years old, the detectives who conducted the investigation, and

---

[4] Under C.G.S. Sec. 18-7a, Mr. Pitman's sentence is a good-time earning sentence.

Dr. Henry C. Lee, then-Director of the Connecticut Forensic Lab in Meriden, Connecticut.

12. Given the current pandemic, there is no ability to interview the witnesses or to obtain records pertaining to either the criminal backgrounds or any favorable treatment received by those witnesses.

13. It is also impossible to search the records of the state police laboratory in Meriden, Connecticut, where the forensic evidence in the case was examined and "processed," or to attempt to locate such evidence in the police department or the courts.

14. Upon information and belief, the trace evidence or bloodstains were returned to the submitting agency, i.e., the Hartford Police Department, after testing occurred at the lab.

15. On October 18, 1985, five days after Gloria Pittman was seen walking away from her car, Detectives Marrero and Pepin, the lead detectives in the investigation of the disappearance, executed a search warrant of Mrs. Pittman's car. Present during the execution of the warrant was Dr. Lee.

16. In examining the car, various items described as having "brownish stains," "crusts and stains," and items exhibiting a "very light reaction to blood" were recovered and subjected to field testing. Some of those "field tests" showed a result known as "presumptive positive for blood." They were then taken to the lab for further examination and testing.

17. Dr. Lee testified that he was later able to determine that several items had the presence of human blood—some Type AB, some Type A and some Type B. Mrs. Pittman had Type B blood. The clothing and pocketbook later recovered from the skeletal remains of Gloria Pittman also had A and B bloodstains. Mr. Pittman has Type O blood.

4

18. Dr. Lee's testimony concerning the examination of those items seized from the car was essential to the state's case. He testified to a piece of a white plastic bucket examined by him that had what appeared to have human blood on it, also Type A and B. He also gave his opinion that it appeared that the front passenger seat had been "smeared" with blood and was subsequently cleaned.

19. The state emphasized this as a key item of evidence because one of Mrs. Pittman's children, eight-year-old Jamel, testified that when Mr. Pittman took the children to the laundromat after their mother had left the family home on the day of her disappearance, he saw Mr. Pittman washing the interior of his mother's car with bleach, using the bucket, and wringing out the rags he was using. Jamel said that he saw "red and brown" water coming out of the rags. Obviously, the imprimatur of a renowned expert such as Dr. Lee together with the boy's testimony could only prove to be enormously influential in the case.

20. Dr. Lee testified that he had not tested the interior of the car or any of the samples that he removed for the presence of bleach or any cleaning agent.

21. Dr. Lee's testimony purported to establish that thirteen separate samples taken from the interior and the trunk of Mrs. Pittman's car appeared to be "blood of human origin."

22. The Connecticut Supreme Court has found that "presumptive" evidence of blood has "no probative value whatsoever," stating that the test result in one case "did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe" and was therefore "totally irrelevant." *State v. Moody*, 214 Conn. 616, 628 (1990).

23. None of the evidence testified to by Dr. Lee has ever been subjected to DNA testing. Thus, there is no direct evidence establishing that the "stains" or "crusts" from the car are directly linked to Gloria Pittman.

24. Importantly, the Type A bloodstains – which were recovered both from the car and from Mrs. Pittman's remains along with her clothing and pocketbook, and clearly do not belong to either Gloria or John Pittman – have never been subjected to DNA testing to be put through the CODIS database or otherwise investigated.

25. This is in part due to the fact that the evidence is "missing" and/or has been deemed "destroyed," although Mr. Pittman has been seeking to have such testing done since the beginning.

26. In 1996, in connection with a post-conviction proceeding, CV91-12295, Bishop, J., information was developed that showed that items received from the vault of a Hartford courthouse had been marked "Received" by the Examiner of Received Property of the Judicial Department on September 12, 1991, and then marked "Destroyed" on September 23, 1991.

27. The items "tested" by Dr. Lee have not been located to this date, and given the current pandemic situation, it is impossible to investigate their whereabouts.

28. This type of unreliable and scientifically invalid "presumptive blood" testimony has led to wrongful convictions in a recent Connecticut case. In a case relying principally on incentivized testimony, Dr. Henry Lee testified that he examined and tested a brown smear on a towel, and determined there was "presumptive" evidence of blood. In fact, he had not even examined the towel and the smear was not blood at all. The Connecticut Supreme Court ruled that the state had a duty to alert the trial court and the petitioner that

Dr. Lee's testimony was incorrect. *See Birch v. Commissioner*, 334 Conn. 37 (2019) (discussing murder convictions of two men).

29. In his habeas corpus petition now pending in state court, the Petitioner intends to challenge the existence and significance of this forensic evidence. *See Pittman v. Commissioner of Correction*, Docket No. CV19-5000367, habeas corpus petition (annexed hereto as Attachment C).

       *b. The Pending Habeas Corpus Action*

30. On September 28, 2019, Mr. Pittman filed a petition for writ of habeas corpus in state court under C.G.S. Sec. 52-466 (petition). The undersigned appeared in the matter on October 17, 2019.

31. Through his habeas petition, Mr. Pittman intends to show:

    a.   That the petitioner's due process rights were violated as the result of the introduction of scientifically invalid evidence;

    b.   That newly discovered forensic evidence entitles him to a new trial under C.G.S. Sec. 52-582 (b) ("newly discovered evidence in support of a petition for new trial may include newly discovered forensic scientific evidence …including that which might undermine any forensic scientific evidence presented at the original trial…[and] the court shall consider whether relevant scientific evidence was not discoverable at the time of the original trial based upon a consideration of whether the relevant scientific evidence has changed since the applicable trial date…or the most recent petition under this section.")

32. On February 7, 2020, the Respondent filed an application for an Order to Show Cause why the petition should not be dismissed pursuant to C.G.S. Sec. 52-470.

33. A hearing was set on that Motion for March 12, 2020. The Petitioner filed a Motion for Continuance on the hearing, which the habeas court granted.

34. By Notice dated March 27, 2020, the court informed the Petitioner:

> AT THE DIRECTIVE OF THE CHIEF COURT ADMINISTRATOR ONLY THOSE COURT FUNCTIONS DESIGNATED AS A PRIORITY ARE CURRENTLY BEING CONDUCTED. AS A NON-PRIORITY CIVIL MATTER HABEAS HEARINGS AND TRIALS WILL NOT BE OCCURING DURING THIS TIME AND THIS NOTICE IS BEING SENT TO ALL EFFECTED CASES. THESE CASES WILL BE RESCHEDULED IN DUE COURSE.

35. It is not known when Mr. Pittman can resume litigation of his habeas petition.

   *c.   Application for Compassionate Parole Release*

36. On April 15, 2020, and with the undersigned as counsel, Mr. Pittman submitted an application for compassionate parole release, under C.G.S. Sec. 54-131k, to the Connecticut Board of Pardons and Paroles (BOPP).

37. His application discussed his thorough rehabilitation, his health conditions, and the support that awaits him upon his release. *See* Attachment D, Application to BOPP.

38. By email dated April 30, Richard Sparaco – Executive Director of the BOPP – informed counsel that the application was denied. The email stated, in part: "Unfortunately, [Mr. Pittman] does not meet the eligibility criteria outlines in the statute as he is not debilitated, incapacitated or infirmed as a result of his condition(s). He is housed in general population and is caring for himself with limited involvement from medical staff." *See* Attachment E, E-Mail from Richard Sparaco.

39. Mr. Pittman's underlying chronic condition and increased risk of death or serious illness was never addressed by the BOPP.

## II.     THE COVID-19 CRISIS

### a.   The COVID-19 Pandemic has Created a Statewide and National Emergency.

40. COVID-19 is a highly infectious, novel coronavirus that has reached pandemic status. As of May 5, 2020, more than 3.6 million individuals around the world have been diagnosed with coronavirus and more than 250,000 people have died as a result.[5]

41. In the United States alone, more than 1.1 million people have been diagnosed with coronavirus as of May 5, resulting in nearly 70,000 deaths.[6] There are more than 30,000 confirmed cases and 2,633 deaths in the state of Connecticut.[7]

42. COVID-19 is ten times deadlier than the H1N1 influenza pandemic of 2009.[8] A vaccine is not expected to be available for another 12 to 18 months.

43.  Individuals 65 years and older are considered high-risk for "severe illness," as are those with liver disease, like Mr. Pittman, who has Hepatitis C.[9]

44. Transmission of COVID-19 is thought to occur predominantly via person-to-person contact and contact with infected surfaces. Coughing and sneezing produce respiratory

---

[5] *Coronavirus Map: Tracking the Global Outbreak,* N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed May 5, 2020).

[6] Centers for Disease Control and Prevention*, COVID-19: Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed May 5, 2020).

[7] Connecticut Department of Public Health*, COVID-19 Update May 05, 2020* (May 5, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5052020.pdf.

[8] Bill Chappell, *WHO Says COVID-19 Immunity Is An Unknown; Disease '10 Times Deadlier' Than 2009 Flu*, NPR (Apr. 13, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/13/833534116/who-says-covid-19-immunity-is-an-unknown-disease-10-times-deadlier-than-2009-flu.

[9] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People Who May Be at Higher Risk for Severe Illness* (2020)*,* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

droplets which spread COVID-19 to individuals in close proximity—as far as six feet away. The virus can remain in the air for several hours and on surfaces for several days.

45. Containment and social distancing are two main categories of interventions intended to prevent the spread of COVID-19. Containment includes intensive handwashing, decontamination of surfaces, and identification and isolation of infected individuals and close contacts. Social distancing involves remaining six to twelve feet from other people.

    *b. Incarcerated Individuals Are Particularly Vulnerable to COVID-19 Infection.*

46. Prisons are particularly susceptible to the spread of infectious diseases. HIV, Hepatitis B and C, and tuberculosis are significantly more common in prisons than in the community at large. Severe outbreaks of H1N1 influenza occurred in prisons during the epidemic in 2009.

47. As of May 5, 2020, of the ten largest clusters of COVID-19 cases in the United States, seven are in prisons and jails. The largest single outbreak in the entire United States is at an Ohio prison, with 2,341 cases.[10]

48. Many prison facilities lack the medical infrastructure necessary to identify, isolate, and treat infected individuals. Medical care is often provided by part-time or under-qualified individuals with inadequate personal protective equipment. These limited resources increase reliance on already-taxed outside healthcare facilities.

49. Many prisons lack sanitary equipment to appropriately disinfect surfaces, and personal protective equipment for prisons and correctional staff.

---

[10] *Coronavirus in the U.S.: Latest Map and Case Count,* N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed May 5, 2020).

50. Asymptomatic persons can carry and transmit COVID-19. Screening and isolation of symptomatic cases alone will not prevent the spread of the virus.

51. Placement of incarcerated individuals in solitary confinement, as DOC has done for some persons who tested positive for the virus, is not an effective method of preventing exposure to COVID-19. Solitary confinement units share ventilation systems with other parts of the prison facility, potentially allowing for airborne viral transmission. Meal preparation and service necessitate contact with correctional staff, and hygiene activities such as showering carry the risk of exposure to infected surfaces.

> *c. Respondents Have Failed to Adequately Respond to COVID-19 in Connecticut Prisons Including Cheshire CI.*

52. As of May 5, 356 DOC staff members and 471 inmates have tested positive for COVID-19. Six inmates have died of the virus thus far.[11] It is not known if any of the deceased inmates lived at Cheshire CI.

53. Connecticut is currently experiencing a widespread outbreak of COVID-19. Nonetheless, the prisons continue to face a constant influx of persons from community settings, including both correctional staff and newly incarcerated individuals.

54. At Cheshire CI, inmates and corrections officers have tested positive for COVID-19. The exact numbers are unknown because the DOC has stopped releasing data by facility.

55. Conditions in Cheshire CI present significant potential for rapid spread of COVID-19. Incarcerated individuals are in close proximity on a constant basis, and interact frequently

---

[11] Connecticut Department of Correction, *COVID-19 Tracker* (May 3, 2020), https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories.

with communal surfaces. The facility layout does not allow social distancing and spaces are poorly ventilated.

       d.  *Petitioner John Pittman Is Especially Vulnerable to COVID-19.*

56. Mr. Pittman has a number of risk factors in addition to his status as an incarcerated individual that make him particularly vulnerable to severe COVID-19.

57. Mr. Pittman is 66 years old. In a preliminary report, individuals had an overall mortality rate of 1.38%, while those over 60 had a mortality rate of 6.4%.[12] Nearly every study or data set has shown a much higher fatality rate for older individuals.

58. In addition, Mr. Pittman was diagnosed with Hepatitis C in 2017 and again in 2019. Those with liver disease, like Mr. Pittman, are at an increased risk for severe COVID-19 complications and death. *See* Affidavit of Danielle C. Ompad, Ph.D. ("Ompad Aff.") ¶6b, annexed as Attachment F.

59. Mr. Pittman is at high risk of exposure to COVID-19 in prison. He is aware that other inmates have COVID-19, that correctional officers have the virus as well, and that at least six inmates have died from the virus in Connecticut prisons. He lives with a cellmate, making it impossible for him to self-isolate to protect himself from the virus.

60. Counsel was informed last week that, after having been in quarantine for only seven days, inmates who had been exposed to the virus were transferred into the T.R.U.E. Unit where Mr. Pittman lives from elsewhere in the prison.

---

[12] Robert Verity et al., *Estimates of the severity of coronavirus disease 2019: a model-based analysis*, The Lancet (Mar. 30, 2020), *available at* https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-7.

61. Mr. Pittman and his family members are terrified that if he contracts COVID-19, he will become very sick and die because of his age and medical conditions. His family is anxious for his release from the dangerous conditions in which he is living.

62. Mr. Pittman wishes to be released to live with his mother in New Haven. His mother is willing to meet all of his needs and take care of him, and has a bedroom set up for his arrival. His mother is also willing to personally provide transportation for Mr. Pittman from Cheshire CI to New Haven. *See* Attachment G, Statement of Vivian Hilton, dated 4/14/20.

63. Mr. Pittman could self-quarantine in New Haven for as long as necessary. He should be allowed to go to New Haven where he has family support and a safe, stable place to live.

64. If released, Mr. Pittman could seek health care at Transitions Clinic-New Haven, which provides medical care and referral services for individuals with chronic diseases who have recently been released from prison. Dr. Lisa Puglisi, Director, specializes in the treatment of Hepatitis C and states that Mr. Pittman is eligible to enroll in the clinic upon his release. *See* Attachment H, Letter from Dr. Puglisi, dated 4/15/20.

## EXHAUSTION OF STATE COURT REMEDIES

65. There is no statutory exhaustion requirement under 28 U.S.C. § 2241.

66. If the Court concludes that there is an exhaustion requirement under 28 U.S.C. § 2241, or that Mr. Pittman must properly proceed on this petition under 28 U.S.C. § 2254, then any failure to exhaust should be excused as futile.

67. The Connecticut Judicial Branch is functionally unavailable to serve as an avenue for relief due to the unprecedented interruptions to all sectors of society caused by COVID-19.

68. The Connecticut state courts are operating at severely reduced capacity. According to its March 12, 2020, Continuity of Operations Plan, the Judicial Branch was scheduling and hearing only items considered "Priority 1 Business Functions."

69. Habeas petitions are not in the category of "Priority 1 Business Functions," nor are any other mechanisms by which individuals in the state's custody may challenge the legality of their confinement.

70. Connecticut General Statutes § 52-466 requires that a petition for a writ of habeas corpus be made to the Superior Court for the Tolland Judicial District.

71. As of the filing of this Petition, no courthouse is open in the Tolland Judicial District; no courthouse has been specified for transfer of matters ordinarily before that court.

72. As of April 15, 2020, the six operating Superior Courts have begun accepting non-Priority 1 civil filings via lockboxes in their lobbies. There has been no provision made for filings at the Superior Courts, including the Tolland Judicial District, that are not currently operating, nor for expedited processing of emergency filings.

73. Therefore, there is no state forum available to hear Mr. Pittman's petition, rendering it impossible for him to seek relief from his continued confinement through the processes established by the State of Connecticut.

74. On this habeas petition, no statutory exhaustion requirement applies under 28 U.S.C. § 2241. To the extent the Court determines this petition is cognizable only under 28 U.S.C. § 2254, or that a prudential exhaustion requirement applies under 28 U.S.C. § 2241, such a petition is not subject to an exhaustion requirement when pursuing state remedies would be futile, including in the "absence of a state corrective process" or when "circumstances exist that render state processes ineffective to protect petitioner's rights."

*Id.* § 2254(b)(1)(B)(i-ii); *see Duckworth v. Serrano*, 454 U.S. 1, 3 (1981); *Washington v. James*, 996 F.2d 1442, 1449 (2d Cir. 1993).

75. The functional closure of Connecticut courts in the face of the COVID-19 pandemic constitutes the absence of a state corrective process and circumstances that render state processes ineffective to protect Mr. Pittman's rights.

76. Inordinate delay in processing claims can also render exhaustion futile. *U.S. ex rel. Goodman v. Kehl*, 456 F.2d 863, 869 (2d Cir. 1972). To the extent that the state courts are conducting any business, their pace is insufficient to protect Mr. Pittman's rights.

77. Given the unprecedented circumstances created by COVID-19, a delay of even days or weeks in docketing and considering Mr. Pittman's claim for relief constitutes a violation of his rights, and could threaten his very life.

78. In view of the pandemic, it is impossible for Mr. Pittman to litigate his legitimate post-conviction claims. Counsel cannot search for forensic evidence, let alone seek testing if we are able to locate it. We cannot interview witnesses. There is no way to conduct research into the backgrounds of the incentivized witnesses or of any consideration they may have received other than their testimony against Mr. Pittman. Counsel cannot seek subpoenas for missing forensic evidence. With the courts closed, counsel cannot engage in any discovery, even taking into account the limited discovery available to the petitioner in habeas court.

79. Because he cannot litigate his claims through his habeas petition, the court has effectively suspended the writ. He is not only foreclosed from the tribunal provided to him by Connecticut law, he is also being held in life-threatening conditions with no access to the court to contest the conditions of his confinement.

## JUDICIAL AUTHORITY TO ADMIT TO BAIL

80. This Court has the "inherent authority" to admit a state prisoner to bail and order his immediate release pending adjudication of his habeas petition. *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *see also Rado v. Meachum*, 699 F. Supp. 25, 26 (D. Conn. 1988) ("A federal court has the inherent power to release a state prisoner on bail pending resolution of his habeas petition.").

81. To qualify for admission to bail, an individual must show that "extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 230.

82. The risk that COVID-19 poses to Mr. Pittman given his age and medical conditions is an extraordinary circumstance that warrants his immediate release. If Mr. Pittman remains incarcerated, there is a high risk he will contract COVID-19 and as a result suffer severe illness or death. Immediate release is therefore the only way for Mr. Pittman to vindicate the habeas remedy.

## LEGAL CLAIMS

## FIRST CAUSE OF ACTION

## <u>VIOLATION OF EIGHTH AMENDMENT</u>

83. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

84. The Eighth Amendment protects incarcerated individuals from cruel and unusual punishment, which extends to conditions of confinement. Prisons have an affirmative obligation to provide adequate care to address prisoners' medical needs, *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976), and officials may not ignore conditions that are likely

to cause grave illness in the future, *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003).

85. Officials violate incarcerated individuals' rights when they are deliberately indifferent to

conditions of confinement that are likely to cause them serious illness and that pose an

unreasonable risk of serious damage to their future health. Tthe government violates the

Eighth Amendment when it crowds prisoners into cells with others who have "infectious

maladies" or otherwise exposes prisoners "to a serious, communicable disease." *Helling*

*v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney,* 437 U.S. 678, 682 (1978)).

This is true "even though the possible infection might not affect all of those exposed." *Id.*

86. COVID-19 presents a high risk of serious illness or death for individuals with underlying

health conditions and for individuals of advanced age. DOC officials are aware of this

risk and have failed to take reasonable steps to prevent future harm.

87. Before the COVID-19 outbreak, Respondents lacked adequate medical staff, personal

protective equipment, and medical facilities to provide medical care during an outbreak

of this nature. Its insufficient response has created unconstitutional conditions of

confinement.

88. Respondents and other DOC staff continue to knowingly and recklessly subject Mr.

Pittman to conditions under which he faces imminent risk of contracting COVID-19. He

is at a high risk of mortality secondary to infection, and respondents' failure to take

appropriate steps to abate this risk constitutes deliberate indifference to Mr. Pittman's

right to be free from cruel and unusual punishment.

89. Respondents can fulfill the constitutional requirement to mitigate the risk at which they

have placed Mr. Pittman only by releasing him. *See DeShaney v. Winnebago Cty. Dep't*

*of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* . . . medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.").

90. Respondents are violating Mr. Pittman's Eighth Amendment rights by continuing to confine him in conditions that greatly increase his risk of exposure to COVID-19, which could prove deadly due to his advanced age and comorbidities.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner John Pittman respectfully requests that the Court:

a) Admit him to bail and order his immediate release pending disposition of the underlying petition;

b) Order prompt return by Respondent Warden Butricks;

c) Issue a Writ of Habeas Corpus and order his immediate release from custody to his mother in New Haven;

d) Award him his costs and reasonable attorneys' fees; and

e) Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,


/s/ Darcy McGraw (ct02369)
Director, Connecticut Innocence Project and Post-Conviction Unit
2275 Silas Deane Highway, 2nd Floor
Rocky Hill, CT 06067
Tel: 860-258-4940
Fax: 860-258-4949
darcy.mcgraw@jud.ct.gov


/s/ Evan Parzych (ct30571)
Deputy Assistant Public Defender
Connecticut Innocence Project and Post-Conviction Unit
2275 Silas Deane Highway, 2nd Floor
Rocky Hill, CT 06067
Tel: 860-258-4940
Fax: 860-258-4949
evan.parzych@jud.ct.gov


*Counsel for Petitioner*

May 6, 2020